DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Julie A. Bolt has appealed from a decision of the Wayne County Court of Common Pleas that convicted her of uttering a forgery. This Court affirms.
 I {¶ 2} As an initial matter, this Court notes that the State failed to file an appellate brief. As such, this Court may accept Appellant's statement of the facts and issues as correct. App.R. 18(C).
 {¶ 3} On May 8, 2003, Appellant was indicted by the Wayne County Grand Jury on one count of uttering a forgery, in violation of R.C. 2913.31, a felony of the fifth degree. The basis of the indictment was a forged check made payable to Ms. Amy Ickes, in the amount of $14.74. Appellant pleaded not guilty to the crime as charged in the indictment and the matter proceeded to a jury trial. The jury returned a verdict of guilty on the charge of uttering a forgery. A sentencing hearing was held on November 19, 2003, and the trial court sentenced Appellant to a term of twelve months probation.
 {¶ 4} Appellant has timely appealed, asserting two assignments of error.
 II Assignment of Error Number One
"The trier of fact's finding that appellant violated [R.C.2913.31], knowingly uttering a forgery, is against the manifest weight of the evidence."
 {¶ 5} In Appellant's first assignment of error, she has argued that her conviction for uttering a forgery was against the manifest weight of the evidence. This Court disagrees.
 {¶ 6} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 7} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 8} In the case sub judice, Appellant was convicted of uttering a forgery, a violation of R.C. 2913.31(A)(3). That section provides, in pertinent part:
"(A) No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
"* * *
"(3) Utter, or possess with purpose to utter, any writing that the person knows to have been forged."
 {¶ 9} R.C. 2901.22(B) further provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." This Court has held that to determine whether a person acts "knowingly," her state of mind must be determined from the totality of circumstances surrounding the alleged crime. State v. Cureton,
9th Dist. No. 01CA3219-M, 2002-Ohio-5547, at ¶ 15, appeal denied (2003), 100 Ohio St.3d 1412, citing State v. Dorsey (Feb. 13, 1991), 9th Dist. No. 90CA004796.
 {¶ 10} On appeal, Appellant has argued that the State failed to prove that she "knowingly" passed a forged check or that she knew that the endorser's signature on the back of the check was a forgery. Specifically, she has argued that "the testimony of virtually every witness failed to show that Appellant, even if she was the one who uttered the check, had actual knowledge that Beth Ann Ray forged Amy Ickes' signature on the back of the check as an endorsement." Appellant has further argued that Beth Ann Ray, the person who confessed to forging the check and who has since been convicted of several crimes of deceit, was a less than credible witness.
 {¶ 11} At trial, Ms. Kathleen Imhoff testified on behalf of the State. Ms. Imhoff testified to the following. In November 2002, she was employed as a manger with A W, All American Good ("A W"), which was located on Lincoln Way, in Wooster Ohio; the A W was located in the same building as a store called Marathon Mart. On November 22, 2003, Ms. Imhoff issued a payroll check to Ms. Ickes, an A W employee, but because Ms. Ickes was not available to pick up the check Ms. Imhoff placed the check in the drawer of her desk at work. Ms. Imhoff was later informed by a Marathon Mart employee that the payroll check issued to Ms. Ickes had been cashed. Ms. Imhoff reviewed the check and discovered that it had not been endorsed by Ms. Ickes. Ms. Imhoff also reviewed a videotape obtained from the store surveillance camera and the tape confirmed that Ms. Ickes was not the person who cashed the check. Ms. Imhoff then spoke with Ms. Ickes, who informed Ms. Imhoff that she did not pick up her payroll check. Ms. Imhoff filed a police report as a result.
 {¶ 12} Laura Heath, an employee at Marathon Mart, also testified on behalf of the State. She stated the following to the jury. Ms. Heath was familiar with Beth Ann Ray; Ms. Ray previously worked at the A W store located in the same building as Marathon Mart. Ms. Heath was working behind the counter at Marathon Mart on November 23, 2002, at approximately 11:30 p.m., when she saw Ms. Ray enter the A W section of the building. Ms. Heath watched Ms. Ray's movements because "it was kind of late for her to be out because she normally worked in the morning." Ms. Heath walked around to the back door of the A W section of the store and asked Ms. Ray "what are you doing" in a joking manner. Ms. Ray told her that she was trying to find something. Ms. Heath then turned on the lights in the A W section, and then "went about [her] business."
 {¶ 13} Before Ms. Ray left the store, she asked Ms. Heath to cash a payroll check in the amount of $169. Ms. Heath noticed that the check appeared odd because it "had white on it." Ms. Heath cashed the check despite its odd appearance because Ms. Ray "was employed by the A W and it was an A W check. So [she] figured it was legitimate and that's the only reason [she took] the check."
 {¶ 14} At approximately 6:00 a.m. on November 24, 2003, Ms. Heath was still working at Marathon Mart when she saw Ms. Ray re-enter A W. Ms. Ray stayed in the store for approximately five minutes and then left again. Immediately after Ms. Ray left the store, a woman with blond hair entered Marathon Mart. The woman, whom Ms. Heath later identified in court as Appellant, "looked really disoriented and messy. She was missing an eye. She had hair that was covering the eye and she kept over and over pulling her hair down like a nervous habit." Appellant approached the counter and asked Ms. Heath if she could cash a payroll check for her. Ms. Heath cashed the check, which was in the amount of $14.74. Ms. Heath explained that she never met Appellant, but because she was not close friends to all of the A W employees she was not sure whether Appellant was an employee of A W. However, when Ms. Heath asked Appellant whether she was an A W employee, Appellant replied: "Yes." Appellant purchased a pack of Pall Mall cigarettes with the proceeds of the check; a register receipt showing the cigarette purchase and the amount of the payroll check was provided to the jury. When Appellant left the store, she got into a red car with Ms. Ray. Ms. Heath stated that she was "absolutely positive" that Appellant was the same women who entered Marathon Mart to buy cigarettes with an A W payroll check.
 {¶ 15} Another employee of Marathon Mart, Anna Stern, testified for the State. Ms. Stern was employed with Marathon Mart as a manager. While reviewing the register tape that recorded all of the store's transactions, Ms. Stern stated that at approximately 5:57 a.m. a transaction occurred in which a pack of Pall Mall cigarettes was sold for $2.65 and paid for with a check in the amount of $14.74. Ms. Stern further explained that security cameras were placed throughout the store. A security camera was located above the register, which recorded all transactions that occurred on the night of November 23, 2002, and the morning of November 24, 2002. Appellant's trial counsel stipulated that the videotape recovered from the store showed Appellant entering the store and completing a transaction. On cross-examination, Ms. Stern explained that another transaction occurred at 5:48 a.m. on the morning of November 24, 2002, at which time a customer also purchased a pack of Pall Mall cigarettes with cash. Ms. Stern further admitted that the time date stamps on the register tape, which the State used to show Appellant purchased cigarettes with a payroll check, and the surveillance tape were inconsistent. The register tape showed that a transaction occurred at 5:57 a.m., but the surveillance tape showed Appellant purchasing cigarettes at 5:59 a.m. Ms. Stern explained, however, that the cash registers were not synchronized with the security cameras, which could account for the time discrepancies.
 {¶ 16} Beth Ann Ray also took the witness stand on behalf of the State. Ms. Ray stated that she met Appellant at a "drug house" on the night of November 23, 2002. She admitted that she was using crack cocaine and was involved in another unrelated case concerning forged checks; she explained that she had pleaded guilty to forging checks she had stolen from her mother. When shown a copy of the check in the amount of $14.74, she acknowledged that she took the check from A W in the early morning of November 24, 2002, and was responsible for signing Ms. Ickes' name on the back of the check. She further admitted that Ms. Ickes did not give her permission to endorse the check on her behalf. Ms. Ray testified that Appellant was present when she forged Ms. Ickes' name on the check; after which she handed the check to Appellant to cash. She stated that after Appellant cashed the payroll check in Marathon Mart, the two women went back to the drug house and brought crack cocaine with the money from the forged check.
 {¶ 17} On cross-examination, Ms. Ray admitted that she and Appellant were high on crack cocaine on the night of November 23, 2002. She denied any knowledge that Appellant was staying at a trailer owned by Herb Coppa so she could escape an abusive relationship. Ms. Ray believed Appellant was living with Mr. Coppa so she could smoke crack cocaine. Ms. Ray admitted that she told two people, Alice Ray and Tim McElfresh, that if she was ever caught for forging checks should was "going to take someone with [her]."
 {¶ 18} Lieutenant Steve Glick, a police officer with the City of Wooster Police Department, presented testimony on behalf of the State. Lieutenant Glick stated that he was dispatched to investigate the passing of forged checks on November 25, 2002. In the course of his investigation, Lieutenant Glick talked to Ms. Heath, Ms. Stern, and Ms. Imhoff. After talking to employees of Marathon Mart and A W, and watching the surveillance tape, "the first suspect [he] developed was Beth Ray primarily from the first check that was — that had been passed that she passed herself using her name. The second suspect [he] developed was [Appellant] based on the descriptions that the cashier gave [him]." The officer further explained that after hearing the description of a thin, blond woman with one eye, he knew it was Appellant because he "had personal contact with [Appellant] in the past. [He was] aware that she was a victim of gun shot injury and ha[d] extensive scarring and the loss of her left eye from that incident." Lieutenant Glick stated that he could not locate Appellant for an interview until February 2003. When asked about the forged A W check at Marathon Mart and her involvement with Ms. Ray, Appellant told the officer: "[S]he was in the store probably about the time involved, but didn't know anything about a check. * * * She admitted to buying cigarettes, but denied using the check."
 {¶ 19} On cross-examination, Lieutenant Glick stated that Appellant told him that she was having problems. Her children had been taken from her and placed in foster care. Appellant was attempting to get away from her abusive boyfriend, so she moved in with a man named Herb Coppa. The officer also stated that Appellant did not know she was living in a crack house until after she moved in; she stayed in her bedroom to avoid any problems. Lieutenant Glick stated that Ms. Ray admitted to forging the $14.74 payroll check. The officer testified that he sent the checks, including the check in the amount of $14.74, to the Bureau of Criminal Identification for fingerprint analysis. The partial fingerprint on the $14.74 check did not match Appellant's fingerprints; however, the partial fingerprint was also compared to Ms. Ray, who admitted to forging the check, and it did not match Ms. Ray. The officer further explained that checks generally pass through the hands of "five or six legitimate people."
 {¶ 20} Appellant testified in her own behalf. During direct examination, she explained that as a result of her shot gun injuries she was taking "some pretty strong stuff," like morphine. She testified that she moved into Herb Coppa's trailer because she was having problems with an abusive boyfriend and needed to move. Mr. Coppa told Appellant that he would provide her with a place for "cheap rent" and she accepted the offer "so [she] could get [her] kids back." She further explained that she met Ms. Ray at Mr. Coppa's home on November 24, 2002. Ms. Ray was doing crack cocaine with Mr. Coppa. Appellant stated that she did not get along with Ms. Ray "[b]ecause [she] didn't want [Ms. Ray] in her house. They were all in there doing crack, being noisy, being obnoxious." Appellant stated that the next morning, November 25, 2002, Ms. Ray accused Appellant of smoking crack cocaine with her husband, "Eddie."
 {¶ 21} Appellant admitted that she drove Ms. Ray's car to Marathon Mart in the early morning of November 24, 2002. While driving to Marathon Mart, Ms. Ray "was bugging [Appellant] in the car [about crack cocaine]." Appellant admitted that she purchased a pack of Pall Mall cigarettes, but she claimed that she paid for the item with cash. Appellant could not remember, however, whether she paid for the cigarettes with a five dollar bill or three ones.
 {¶ 22} Based on the testimony presented at trial, this Court finds that the jury did not clearly lose its weigh when it convicted Appellant of uttering a forgery. Two employees of Marathon Mart identified Appellant as the woman who passed a forged payroll check in the amount of $14.74. Appellant admitted to purchasing a pack of Pall Mall cigarettes on the morning in question. The videotape confirms Appellant's story that she purchased cigarettes, but it also shows that she paid for the cigarettes with something other than cash. Her partner in crime, Ms. Ray, testified that Appellant knew the check was forged when she gave it to the Marathon Mart clerk. Furthermore, Appellant never testified that she worked at A W or that she knew Ms. Ickes, the person to whom the check was made payable. The evidence overwhelmingly shows that Appellant knowingly used a forged check, in violation of R.C. 2913.31. Consequently, we find that Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"Appellant's Sixth Amendment right to effective assistance of counsel was denied by that trial counsel's failure to adequately safeguard appellant's interest."
 {¶ 23} In Appellant's second assignment of error, she has argued that she was denied the effective assistance of counsel. Specifically, Appellant has argued that trial counsel was aware that Appellant was suffering from the effects of morphine and other prescription drugs during trial, but that he allowed Appellant to testify on her own behalf, to Appellant's detriment.
 {¶ 24} Appellant bears the burden of proof in a claim of ineffective assistance of counsel. State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 49. In order to establish the existence of such a claim, Appellant must satisfy a two-pronged test. First, Appellant must demonstrate that trial counsel's performance was deficient by showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed Appellant by the Sixth Amendment. Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052,80 L.Ed.2d 674. When analyzing the reasonableness of trial counsel's challenged conduct, this Court must consider the facts of the particular case as they existed at the time of trial counsel's conduct. State v. Palmison, 9th Dist. No. 20854, 2002-Ohio-2900, at ¶ 31. Appellant must identify the acts or omissions of his attorney that he claims were not the result of reasonable professional judgment. Id. This Court must then decide whether counsel's conduct fell outside the range of that which is considered professionally competent. Id.
 {¶ 25} Second, Appellant must also demonstrate that she was prejudiced by her trial counsel's deficient performance.Palmison, 2002-Ohio-2900, at ¶ 30. Prejudice entails "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. This requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial, a trial whose result is reliable. Strickland, 466 U.S. at 687. Additionally, "[a]n appellate court may analyze the second prong of theStrickland test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice." State v.Lansberry, 9th Dist. No. 21006, 2002-Ohio-4401, at ¶ 16, citingState v. Loza (1994), 71 Ohio St.3d 61, 83. Accordingly, we will begin our analysis with a discussion of the prejudice prong of Strickland.
 {¶ 26} Assuming, arguendo, that trial counsel was ineffective for failing to prevent Appellant from taking the stand due to her allegedly impaired mental state, Appellant has failed to show that she was prejudiced by trial counsel's alleged errors. Specifically, Appellant has failed to show that the jury would have reached a different verdict if it did not have the benefit of Appellant's testimony. At trial, Ms. Heath, who stated that she did not know Appellant, testified that Appellant purchased a pack of cigarettes with a check in the amount of $14.74. Ms. Heath testified that she was "absolutely positive" that Appellant was the woman who cashed the forged check. Ms. Heath also stated that Appellant told her that she was an employee with A W. Ms. Ray, a self-admitted crack addict, also testified that Appellant was present when she forged Ms. Ickes' name on the back of the check. Ms. Ray explained that they were going to use the money from the forged check to buy crack cocaine. Further, the surveillance tape showed Appellant entering the store and purchasing cigarettes with a check. Based on the evidence presented, this Court concludes that even if Appellant had refused to take the stand as a result of her allegedly impaired condition, the jury was presented with sufficient evidence to convict her of uttering a forgery. The jury did not need to hear testimony from Appellant to find her guilty of the crime as charged in the indictment. Thus, we cannot say that "but-for" trial counsel's alleged errors the result of the trial would have been different.
 {¶ 27} Appellant's second assignment of error is not well taken.
 III {¶ 28} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, J., Batchelder, J., concur.